IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RICHARD H. HARRISON, JR.,

                      OPINION AND ORDER

           Petitioner,

                      16-cv-124-bbc

     v.

LIZZIE TEGELS,

           Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In 2011, petitioner Richard Harrison, Jr. was charged with repeated sexual assault of his then stepdaughter, D.M.K. There were no third-party witnesses to the alleged assaults and no physical evidence. Instead, the state relied entirely on a recorded interview that D.M.K. gave to the police and the trial testimony of D.M.K.'s mother, Kimberly, who recounted what D.M.K. allegedly told her about the assaults.

Petitioner's theory of the case was that D.M.K.'s mother persuaded her daughter to fabricate the allegations because petitioner and Kimberly were divorcing and she wanted to prevent petitioner from gaining custody over several children that they shared. In his opening statement, petitioner's counsel promised the jury that he would reveal many inconsistencies in D.M.K.'s and Kimberly's allegations, showing them to be incredible. Counsel broke this promise. Although he presented evidence that D.M.K.'s mother had made false accusations against petitioner in the past, counsel failed to present evidence of

1

numerous and significant inconsistent statements that both D.M.K. and Kimberly made about almost every aspect of the alleged assaults, such as the type of conduct involved, the frequency of the assaults, their location and what petitioner allegedly said to D.M.K. during the assaults.  In addition, counsel failed to object to D.M.K.'s statement at trial that petitioner often hid from the police around the time that the alleged assaults occurred, even though it was undisputed that the petitioner's hiding had nothing to do with the alleged sexual assaults.

The jury convicted petitioner and the state court sentenced him to 30 years in prison. After exhausting his remedies in state court, petitioner filed a petition under 28 U.S.C. § 2254 for a writ of habeas corpus, which is fully briefed and ready for review. Now represented by the Wisconsin Office of the State Public Defender, petitioner challenges his conviction on the ground that the Wisconsin Court of Appeals applied <u>Strickland v. Washington</u>, 446 U.S. 668 (1984),  unreasonably  when it rejected his argument that his trial counsel provided ineffective assistance by failing to (1) impeach D.M.K. and her mother with prior inconsistent statements and (2) object to inadmissible character evidence.

In considering any petition for a writ of habeas corpus, a federal court must balance carefully a petitioner's rights under the Constitution with the state's and the alleged victim's right to finality.  Particularly when the alleged conduct involves a heinous crime against a young victim, it is difficult to set aside thoughts about the hardship that the child may have to endure if the case is tried a second time.   On the other side of the scale is the petitioner's right to a fair trial, a right that exists to prevent innocent persons from being convicted

unjustly and, as in prisoner's case, being sentenced to 30 years in prison.  When the interests on both sides are so important, a mistake in overemphasizing either finality or certainty can have serious consequences.

Congress and the Supreme Court have created a legal framework that informs federal courts how to weigh the interests in punishing criminal conduct against the interests in preventing wrongful convictions.  Federal courts can grant relief to prisoners challenging a state conviction, but only in narrow circumstances.  28 U.S.C. § 2254(d).  In light of the deference a federal court must give both trial counsel and the state court, it is a rare case in which a federal court may grant a habeas petition in the context of a claim for ineffective assistance of counsel.  Harrington v. Richter, 562 U.S. 86, 105 (2011).

This is one such rare case.  By failing to present evidence on the very issue he told the jury would prove his client's right to acquittal, petitioner's trial counsel deprived petitioner of the ability to present a defense and receive a fair trial.  Counsel has admitted that his failure to introduce what could have been critical impeachment evidence was the result of his ignorance of the law of evidence, not trial strategy.  Further, because witness credibility was the key issue at trial, counsel's failure crippled petitioner's defense, sending the message to the jury that counsel needed to mischaracterize the evidence because he knew that the evidence supporting petitioner was weak.

The inconsistent statements were not related simply to minute details that could be dismissed easily by the jury as misstatements or the result of a diminished memory.  Some of the differences were fundamental and dramatic, such as the change in D.M.K.'s statement

3

that petitioner assaulted her *hundreds* of times (the statement the jury heard) to a revised estimate of *between one and five* assaults (the statement the jury could not consider). Considering the importance of credibility to the trial, the large number of the inconsistencies and their significance and trial counsel's announcement to the jury that he had ample evidence to show that D.M.K. could not be believed, I conclude that the failure by counsel to impeach D.M.K. and her mother was both deficient and prejudicial and that the conclusion of the Wisconsin Court of Appeals to the contrary was unreasonable.  Although counsel's failure to object to the inadmissible character evidence may have been a less serious error, it  increases the likelihood that petitioner was prejudiced.

Of course, a conclusion that petitioner is entitled to habeas relief does not mean that petitioner is innocent of the crimes of which he is accused.  I am not deciding whether D.M.K. and her mother should be believed, only that petitioner's counsel failed to present important evidence that the jury should have been able to consider. The state retains the right to try petitioner again for the serious crimes alleged, but before petitioner is subjected to a 30-year prison sentence, he should have the opportunity to present a full defense.

OPINION

A.  Background

Petitioner was married to the mother of the alleged victim for approximately six years. (I will follow the parties' lead in referring to the mother as "Kimberly" and the alleged victim as "D.M.K.")  D.M.K. was Kimberly's daughter from a previous relationship.  She was two

1years old when petitioner and Kimberly met; during the relevant time period (2009 and 2010), she was eight or nine years old.  Petitioner and Kimberly had four other children during their marriage.

Sometime in 2010 (several months after Kimberly and petitioner stopped living together), Kimberly filed for divorce against petitioner.  Shortly thereafter, Kimberly contacted the police, alleging that petitioner had sexually assaulted D.M.K.

On September 30, 2010, a police officer, Christine Giacomino, interviewed D.M.K. about this allegation.  In February 2012, after petitioner was criminally charged, D.M.K. provided a second statement about the alleged assaults at petitioner's preliminary hearing. (The parties do not explain the long passage of time between the report to the police and petitioner's preliminary hearing.)

At petitioner's criminal trial in October 2012, defense counsel's theory of the case in his opening statement was that Kimberly prompted D.M.K. to fabricate allegations of abuse so that Kimberly would get custody of the children when they divorced.  (Although petitioner would have no claim of custody over D.M.K. because she was not his biological daughter, a conviction for sexual assault would eliminate any chance that petitioner would win custody of his own children.)  Counsel promised the jurors that they would hear many different, inconsistent versions of events from D.M.K.  Dkt. #6-19 at 106.

The state called D.M.K. to testify, but she had little substantive testimony to offer. When asked whether she "remember[ed] what happened between [her] and [petitioner]," she stated, "Not really, because I don't really think about it."  Dkt. #6-19 at 153-54.

Instead of live testimony, the state presented its case primarily through a tape recorded interview that D.M.K. gave to officer Giacomino on September 30, 2010, more than two years earlier.  Neither the state nor petitioner entered into evidence D.M.K.'s testimony from the preliminary hearing in February 2012.  Petitioner's counsel cross examined D.M.K. about one difference between her testimony at the hearing and her statements during the interview.  In particular, D.M.K. stated during the interview that petitioner had assaulted her outdoors multiple times, but on cross examination at trial, she admitted that she had stated at the preliminary hearing that she could not remember whether any assaults occurred outdoors.  Dkt. #6-19 at 148.

In addition to D.M.K. and officer Giacomino, the only witness the state called was D.M.K.'s mother, Kimberly.  On cross examination, Kimberly admitted that she contacted the police about petitioner's alleged sexual assaults shortly after she filed for divorce.  Id. at 171-72.  In addition, she admitted that she had filed and then withdrawn two restraining orders against petitioner during their marriage and that she had requested the dismissal of one of the restraining orders on the ground that she lied about it.  Id. at 167.  Petitioner's counsel did not cross examine Kimberly about inconsistencies between her trial testimony and statements that she gave the police.

In his case, petitioner called three witnesses: Adrian Cruz (a doctor who examined D.M.K.), Patricia Harrison (petitioner's mother) and petitioner himself.  Cruz testified that he saw no evidence of trauma or infection during his gynecological examination of D.M.K. and that her hymen appeared normal for a girl her age.  Dkt. #6-20 at 6-9.

Patricia Harrison testified that she lived with petitioner and Kimberly during the time of the alleged assaults, that she rarely left the house and that she never observed or heard any signs of the assaults.  Id. at 23, 24, 51-52.  She said that it was easy for her to hear what was going on in the bedrooms because of the way the home's ventilation system was set up.  Id. at 51.  In addition, she said that Kimberly did not have a job and she never left the house without petitioner.  Id. at 26.

During his testimony, petitioner denied that he sexually assaulted D.M.K.  Id. at 65.  During his brief cross examination, the state's counsel did not ask petitioner any questions about the alleged assaults.

During closing arguments, petitioner's counsel tried to talk about inconsistencies in D.M.K.'s statements, but the state's counsel objected on the ground that the statements were not in evidence.  Id. at 111-12.  The court sustained the objection and directed the jury not to consider any evidence that was not admitted.  Id.

The jury found plaintiff guilty of repeated sexual assault of a child under Wis. Stat. § 948.025(1)(d).  The court sentenced petitioner to 30 years in prison, to be followed by 10 years of extended supervision.  Dkt. #6-1.  In post conviction proceedings, petitioner challenged his conviction on the ground that he had received ineffective assistance of counsel.  After holding a hearing in which petitioner's trial counsel testified, the court found that counsel performed deficiently.  Dkt. #6-2 at 127.  However, the court wrote that it was "satisfied by only the thinnest of margins that each layer of deficiency did not result in" prejudice.  Id.  The Wisconsin Court of Appeals affirmed the decision, and the Wisconsin

Supreme Court denied petitioner's request for review.  State v. Harrison, 2015 WI App 43, 362 Wis. 2d 539, 865 N.W.2d 884, review denied, 2015 WI 91, 870 N.W.2d 463.

I will discuss the facts of the case in more detail as they become relevant in the context of the opinion.

## B.  Legal Standard

Petitioner's sole claim is that his trial lawyer provided him constitutionally ineffective assistance.  The Supreme Court set forth the standard for such a claim in Strickland v. Washington, 466 U.S. 668 (1984).  First, petitioner must show that counsel's performance was deficient under an "an objective standard of reasonableness."  Id. at 687-88.  The general question under this prong is whether counsel acted  "within the range of competence demanded of attorneys in criminal cases" in light of "prevailing professional norms."  Id. See also id. (question is "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance").  In making this determination, a court's "scrutiny of counsel's performance must be highly deferential" and viewed from counsel's perspective at the time.  Id. at 689.  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Id.

Second, petitioner must show prejudice, which the Court defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  This does not require a showing that "counsel's deficient

conduct more likely than not altered the outcome in the case." Id. Instead, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. See also Harrington v. Richter, 562 U.S. 86, 112 (2011) ("The likelihood of a different result must be substantial, not just conceivable."). Making this probability determination requires consideration of the "totality of the evidence before the judge or jury," Strickland, 466 U.S. at 695, so a "verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support," id. at 696. See also Harrington, 562 U.S. at 104 (reaffirming Strickland standard).

In the context of a petition for a writ of habeas corpus under § 2254, the standard for ineffective assistance of counsel is "doubly deferential" in light of the standard of review imposed by 28 U.S.C. § 2254(d). Burt v. Titlow, 134 S. Ct. 10, 13 (2013). As relevant to this case, a federal court may not grant a § 2254 petition unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." § 2254(d). "A decision is 'contrary to' clearly established federal law if the rule the decision applies differs from governing law set forth in Supreme Court cases. A decision involves an 'unreasonable application' of Supreme Court precedent if the decision, while identifying the correct governing rule of law, applies it unreasonably to the facts of the case." Bailey v. Lemke, 735 F.3d 945, 949-50 (7th Cir. 2013) (citing Bell v. Cone, 535 U.S. 685, 694 (2002), and Williams v. Taylor, 529 U.S. 362, 407 (2000)).

"Surmounting Strickland's high bar is never an easy task. And establishing on habeas

review that a state court unreasonably applied <u>Strickland</u> under § 2254(d) is all the more difficult." <u>Harrington</u>, 562 U.S. at 105 (internal quotations and citations omitted).   Under <u>Strickland</u>, a state court decision is not unreasonable unless it is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 103.

I will consider first whether petitioner has satisfied the <u>Strickland</u> standard.  If he does, I will consider whether he meets the standard of review under § 2254.

## C.  <u>Applying *Strickland*</u>

### 1.  <u>Overview of petitioner's claim</u>

Petitioner argues that his trial counsel failed him in two respects.  First, counsel failed to present evidence of many inconsistencies in the statements provided by both D.M.K. and Kimberly.  With respect to D.M.K., petitioner says that much of what she said in her recorded interview (which was played for the jury in full at trial) was inconsistent with what she said during the preliminary hearing (which was not disclosed to the jury), but petitioner's counsel brought up only one difference during cross examination.  With respect to Kimberly, petitioner says that his counsel failed to cross examine her about statements she gave the police (again, which the jury did not hear) even though those statements were inconsistent with what she said during trial *and* with what D.M.K. said during both her interview with the police and the preliminary hearing.

Second, petitioner's trial counsel failed to object to the admission of evidence

regarding prior bad acts.  In particular, during D.M.K.'s interview with the police, she made statements about petitioner hiding from the police for unspecified reasons on multiple occasions.

In his opening brief, petitioner refers to another statement in the recorded interview that petitioner once spanked and slapped D.M.K.  However, in his reply brief, petitioner does not respond to the state's argument that trial counsel did not act deficiently by failing to object to that evidence because it was "closely tied to the crime," dkt. #14 at 28, so I assume that petitioner has abandoned that argument.

Below I will describe each of trial counsel's alleged failures in more detail and then consider whether each error fell below an objective standard of reasonableness and whether the cumulative effective of counsel's alleged errors was to prejudice petitioner to the point that it undermines confidence in the jury's decision.


2.  <u>Alleged errors by counsel</u>

a.  Failure to identify D.M.K.'s inconsistent statements

Petitioner points to several key differences between D.M.K.'s statements during her recorded interview and her testimony during the preliminary hearing.   Perhaps the most striking inconsistency is the number of times that D.M.K. stated that petitioner assaulted her.  During the interview, D.M.K. stated that, "every single night" that she lived in Glidden, Wisconsin (a time span of approximately one year), petitioner "touched [her] privates with his privates."  Dkt. #7-2 at 19-20.  However, at the preliminary hearing, D.M.K.'s testimony

differed dramatically on this point.  When she was first asked how many times petitioner touched her inappropriately, she answered, "Um, I don't know." Dkt. #6-11 at 16.  Then she stated that she was "pretty sure" it happened "more than twice."  Id.  When she was asked whether it "could . . . have been only once," she stated, "I don't really know that answer."  Id.  She then changed her mind and said, "I know it happened more than once." Id. at 17.  When asked for a specific number of times, she said "five" but then admitted that was "just a guess."  Id.  Later, when she was asked whether "there was a fifth time," she said, "I don't think there was."  Id. at 45.  Thus, over the span of one cross examination, D.M.K. gave multiple answers that were inconsistent with each other and with her statement during the interview, but the jury was not able to consider that evidence.

The inconsistencies do not stop there.  When D.M.K. was asked during the interview where the assaults occurred, she said, "his room and my room." Dkt. #7-2 at 20.  In addition, she said that he assaulted her outside "behind a . . . truck."  Id. at 21.  Finally, she said that petitioner assaulted her while they "rode in the car" together on occasions when there because "there was no room in [her] mom's" car.  Id. at 39.  However, at the preliminary hearing, D.M.K. stated that each assault occurred inside petitioner's bedroom. Dkt. #6-11 at 17.

As respondent points out, petitioner's trial counsel introduced the portion of the preliminary hearing statements in which D.M.K. admitted that she could not remember the incidents that occurred outdoors.  Dkt. #6-19 at 148-49.  However, counsel did not introduce D.M.K.'s affirmative statement from the preliminary hearing that all of the

assaults occurred in petitioner's bedroom.  Obviously, that testimony is inconsistent not only with D.M.K.'s statement about assaults occurring outdoors, but also with her statements that assaults occurred in the car and in her bedroom.  In other words, during the preliminary hearing, D.M.K. did not identify three of the four locations of alleged assaults that she identified during the interview, including her own bedroom.  Again, that is a substantial inconsistency.

D.M.K. gave inconsistent statements about what petitioner did to her as well.  In her interview, she stated that petitioner put his penis inside her "vagina," "butt" and "mouth," that her "butt" and "privates" "got really sore" after he did that and that he touched her "privates" with his hands.  Dkt. #7-2 at 18, 23-24, 33.  However, during the preliminary hearing, when D.M.K. was asked "what did he touch you in those areas [her vagina and butt] with?" D.M.K said "his penis," but she said nothing about his hands.  Dkt. #6-11 at 13-14.  In addition, she denied that his penis entered her "butt" or "vagina" and she denied that she ever made a contrary statement.  Id. at 16 and 34-35.  In addition, she testified at the preliminary hearing that the assaults happened the same way each time, with petitioner touching her vagina with his penis while she was lying on the bed.  Id. at 33-34, 40, 44. She identified no instance in which petitioner put his penis in her mouth as she had stated in her interview and she identified no instance in which he touched her butt with his penis, even though she had referred to that act in general terms earlier in the same cross examination.

The were other inconsistencies as well.  During the interview, when D.M.K. was asked what time of day the assaults occurred, she said, "on the weekends he did it in the morning

and in the afternoon and at night," dkt. #7-2 at 22; at the preliminary hearing, she stated that each time petitioner assaulted her was in the afternoon, except on one occasion at an unspecified time on the weekend, dkt. #6-11 at 19, 38, 42.  During the interview, D.M.K. alleged multiple times that she complied with petitioner because he threatened to spank her with a belt, dkt. #7-2 at 23, 32, 41 and 57; during the preliminary hearing, she said that she complied "because he told me to," dkt. #6-11 at 33, or because she "didn't want to get in trouble," dkt. #6-11 at 24.  Despite being asked several times during the hearing about any comments petitioner made to D.M.K., she did not mention a threat to spank her.  E.g.,id. at 41-42.

Finally, during the interview, D.M.K. stated that petitioner made her watch pornographic movies on multiple occasions, dkt. #7-2 at 27-29, and that she was fully dressed during some of the incidents, id. at 42.  During the preliminary hearing, she said nothing about pornographic movies and, initially, she stated that her clothes were "off" each time petitioner touched her, dkt. #6-11 at 13, but then qualified her answer to state that her pants were off but not her other clothes, dkt. #6-11 at 33.  The jury was unable to consider any of these inconsistencies.

b.  Failure to identify Kimberly's inconsistent statements

At trial, when Kimberly was asked what D.M.K. told her about petitioner's alleged assaults, her complete statement was that D.M.K. told her that petitioner had "touched [D.M.K.] in places where she shouldn't be touched."  Dkt. #6-19 at 164.  When asked

14

whether D.M.K. provided any other details of the assaults, Kimberly said "no."  Id.

Petitioner's trial counsel did not ask Kimberly about her statement to the police, in which she said that D.M.K. told her that petitioner made D.M.K. "suck his dick" when he "took her for four wheeler rides," something that occurred "quite often."  Dkt. #7-3 at 2. In addition, according to Kimberly's statement to the police, D.M.K. told her that petitioner threatened to "cut out [D.M.K.'s] tongue" if "she ever told anybody" about what he had done to her.   Id.   These statements are inconsistent, not only with Kimberly's trial testimony, but also with D.M.K.'s interview with the police *and* D.M.K.'s testimony at the preliminary hearing.  Thus, each statement that Kimberly and D.M.K. provided is different in significant ways from each of the other statements.

c.  Failure to object to evidence of prior bad acts

During D.M.K.'s interview with the police, officer Giacomino asked D.M.K. about alleged sexual assaults in three different towns at three different Wisconsin homes where D.M.K. and her family lived: Glidden, Park Falls and Neillsville.  (This is yet another inconsistency between D.M.K.'s statements during her interview and her testimony at the preliminary hearing.  During the interview, she said that petitioner assaulted her at all three places, dkt. #7-2 at 50 and 52; during the preliminary hearing, she said that all of the assaults occurred in Glidden, dkt. #6-11 at 17-18.)  When the officer told D.M.K. to "tell [her] about the house in Neillsville," (which seems actually to have been a trailer), dkt. #7-2 at 45.  D.M.K. stated that "there was a little hole that you could just jump in and just crawl"

15

underneath her half-brother's bed.  Id. at 45-46.  She said that petitioner would hide in the hole because a "whole bunch of cops were looking for" him.  Id. She made a similar statement again a few minutes later.  Id. at 49 ("[I]f there were cops [petitioner] would go in there and would go down there [in the hole].").   This portion of D.M.K.'s interview was played for the jury without objection by petitioner's trial counsel.

### 3.  Deficient performance and prejudice

In considering whether trial counsel performed deficiently and prejudiced petitioner under the standard in Strickland, it is important to acknowledge three facts about the context in which the alleged errors occurred.  First, D.M.K.'s statements were the *only* evidence of the alleged assaults.  There were no witnesses to the assaults and the state presented no physical evidence.  This meant that the credibility of the witnesses was *the* key issue for the jury to consider in evaluating the state's case.  Matthews v. Rakiey, 54 F.3d 908, 930 (1st Cir. 1995) ("To state the obvious, there were no witnesses to the May 15, 1986, incident other than the victim and the assailant.  Impeachment evidence therefore becomes all the more vital.").

Second, D.M.K. testified at trial that she could no longer remember what happened between her and petitioner, so petitioner's counsel could not test her credibility by comparing her trial testimony to her previous statements.  Thus, unless counsel presented the jury with D.M.K.'s testimony during the preliminary hearing, the jury would have no way to evaluate the consistency of her statements.

Finally, the theory of the case that petitioner's counsel presented during his opening arguments was that Kimberly prompted D.M.K. to fabricate allegations of sexual assault against petitioner because of an acrimonious divorce proceeding involving custody disputes. Counsel promised to show that D.M.K. should not be believed because of the many inconsistencies in her story:

> I can't tell you right now how many versions of events you are going to hear from [D.M.K.], but I will tell you that it won't be one, it won't be two different versions.  It won't even be three or four.

> The testimony that you hear from [D.M.K.] will test you.  It is very inconsistent and I want you to pay attention to that.

Dkt. #6-19 at 106.  <u>See also</u> Hrg. Trans., dkt. #6-25 at 5 (statement of petitioner's trial counsel that "the thrust of the strategy was to suggest that the victim was not credible because the victim had given various versions of a series of incidents that was unclear"). However, over the course of the trial, petitioner's counsel presented evidence of only one inconsistent statement by plaintiff and no inconsistent statements by Kimberly.  Thus, counsel failed to deliver on his promise that he made to the jury, the promise on which his entire theory of the case relied.  It is unlikely that the jury was not aware of counsel's failure.

a.  Deficient performance

Petitioner's trial counsel admitted  during post conviction proceedings that he did not present evidence of more inconsistent statements by D.M.K. because he "was operating under an incorrect understanding of the law of evidence."  Dkt. #6-25 at 5.  (Apparently, counsel believed that the jury could consider the transcript of the preliminary hearing even

if he did not offer the transcript into evidence.  Id. at 6.)

The only strategic rationale counsel offered was that he "did not want to appear aggressive against a very young . . . alleged sexual assault victim." Id. at 7.  In the abstract, that is more than a legitimate concern, one that is often noted by courts.  E.g., Adams v. Bertrand, 453 F.3d 428, 436 (7th Cir. 2006) (counsel's failure to "vigorously" confront sexual assault victim with prior inconsistent statements was reasonable in light of more aggressive cross examination by co-counsel); Kidd v. Reilly, No. 11-cv-350-JL, 2012 WL 5874321, at *7 (D.N.H. Oct. 15, 2012) ("Counsel defending against sexual-assault charges must tread carefully when cross examining an alleged victim, to avoid arousing juror hostility."), report and recommendation adopted sub nom. Kidd v. North NH Correctional Facility, No. 11-cv-350-JL, 2012 WL 5873709 (D.N.H. Nov. 20, 2012); Gallo v. Kernan, 933 F. Supp. 878, 881–82 (N.D. Cal. 1996) (upholding counsel's tactical decision not to impeach victim with inconsistent statements because of concern that "the jury would feel he was pursuing 'little picky things'"), aff'd, 141 F.3d 1175 (9th Cir. 1998).  In the context of this case, however, declining to impeach D.M.K. made no sense.  If a defendant's only theory at trial is that the alleged victim is not credible, then the defendant cannot refrain from attacking the victim's credibility if he wishes to have any chance of success.  Particularly because counsel promised the jurors that he would show them that D.M.K. provided "many versions of events," no reasonable lawyer would make a strategic decision to break that promise.  Further, during post conviction proceedings, trial counsel could not offer *any* reason why he failed to impeach Kimberly with her own inconsistent statements. Dkt. #6-

25 at 12.

With respect to counsel's failure to object to the other acts evidence, counsel admitted that it did not occur to him to object during trial, but that he "absolutely" believes that he should have done so. Id. at 16. Respondent identifies no legitimate reason why this evidence would be relevant to proving the state's case. Because it is undisputed that the alleged conduct of hiding from the police was *not* related to the alleged sexual assaults, I see no relevance either, so there is no excuse for counsel's failure to object.

Respondent does not deny that petitioner's trial counsel performed deficiently under Strickland, so I see no reason to belabor this issue. Petitioner has satisfied Strickland's first requirement. Steinkuehler v. Meschner, 176 F.3d 441, 445 (8th Cir. 1999) (failure to impeach witness on "especially critical" issue without strategic reason is deficient performance under Strickland); Berryman v. Morton, 100 F.3d 1089, 1099 (3d Cir. 1996) (finding deficient performance when counsel failed to raise victim's prior inconsistent identification testimony because "[t]he reliability of this victim's uncorroborated identification of [the defendant] cut[ ] directly to the heart of the only evidence against [the defendant]"); Nixon v. Newsome, 888 F.2d 112, 115 (11th Cir. 1989) (finding deficient performance when counsel failed to confront prosecution's key witness with inconsistent statements); Blackburn v. Foltz, 828 F.2d 1177, 1183 (6th Cir. 1987) (finding deficient performance when counsel failed to impeach eyewitness with previous inconsistent identification testimony because "weakening [the witness's] testimony was the only plausible hope [the defendant] had for acquittal").

b.  Prejudice

I will consider first the potential prejudicial effect of each of trial counsel's errors.

Then, I will consider the cumulative effect of the errors.  Crisp v. Duckworth, 743 F.2d 580,

583 (7th Cir. 1984) ("[E]ven if individual acts or omissions are not so grievous as to merit

a finding of incompetence or of prejudice from incompetence, their cumulative effect may

be substantial enough to meet the Strickland test.").

1) failure to identify D.M.K.'s inconsistent statements

As an initial matter, respondent denies that D.M.K.'s statements were as inconsistent

as petitioner suggests, arguing that many of the perceived inconsistencies were a result of

different questions being asked rather than contradictions in D.M.K.'s version of events.  It

is true that, in his opening brief, petitioner treats some of D.M.K.'s answers as "inconsistent"

simply because D.M.K. gave different answers to different questions.  However, I have

omitted all of those answers from my description of inconsistent answers discussed above.

I believe that it is clear from that description that the inconsistent statements I identified

are not simply a result of differently worded questions.

For example, respondent says that, at the preliminary hearing, "defense counsel never

specifically asked [D.M.K. whether petitioner] threatened to spank her."  Dkt. #14 at 19.

This is true but irrelevant because the police officer did not ask D.M.K. whether petitioner

threatened to spank her either.  Rather, in both cases D.M.K. was asked open ended

questions about what petitioner said.  In fact, during the preliminary hearing, counsel asked

D.M.K. repeatedly what petitioner said to her during the assaults.  Dkt. #6-11 at 22, 28, 35, 39, 41-42, 44.  D.M.K.'s only answers were that petitioner told her to "take [her] pants off, put [her] pants back on, go to [her] room and play games or go back downstairs and watch TV."  Id. at 42.  She confirmed that those statements were "the only three things [petitioner] said to [her] on each occasion."  Id.  Thus, D.M.K. had ample opportunity to discuss petitioner's alleged threats to spank her.  She failed to do so, even though she mentioned those alleged threats several times during the police interview and even though those threats were the reason she gave during the interview for complying with petitioner's demands. Dkt. #7-2 at 23, 32, 41 and 57.

With respect to D.M.K.'s inconsistent answers regarding the number of times petitioner assaulted her, respondent argues that the inconsistencies are not important because the final answer that she gave at the preliminary hearing (four assaults) would have been sufficient to convict petitioner under Wis. Stat. § 948.025(1)(d), which requires at least three sexual assaults of the same child.  This argument misses the point.  Petitioner is not challenging the sufficiency of the evidence to convict him; rather, he is arguing that his trial counsel was ineffective for failing to expose key weaknesses in the alleged victim's credibility.  If D.M.K. had difficulty remembering whether it was six or seven times that petitioner had assaulted her, it would be plausible to argue that the difference was inconsequential because either number satisfied the statute.  However, the difference between D.M.K.'s original answer (suggesting more than 300 assaults) and her later answers (between one and five assaults) is so vast that it calls into question the veracity of *all* of

D.M.K.'s statements, not just her statement that the assaults occurred "every single night."

Respondent makes more general arguments as well.  First, respondent says that the state likely would have introduced all of D.M.K.'s testimony during the preliminary hearing if petitioner's counsel had focused on the inconsistent statements in that testimony.  This, respondent says, would have allowed the jury to hear the consistent statements that D.M.K. provided.  The jury would have heard as well D.M.K.'s "detailed account of [petitioner] touching her vagina four times in his bedroom at the house in Glidden," which could have "helped cement [petitioner's] guilt in the minds of jurors."  Resp.'s Br., dkt. #14, at 16.

These arguments are not persuasive.  For one thing, some of the "consistent" statements that respondent identifies are not actually consistent.  For example, respondent says that D.M.K. "consistently said that [the assaults] happened more than three times in the house at Glidden," id., but that is incorrect.  As discussed above, at the preliminary hearing, when D.M.K. was asked how many times petitioner assaulted her, her first answer was "[u]m, I don't know." Dkt. #6-11 at 16.  Then she stated that she was "pretty sure" it happened "more than twice." Id.  When she was asked whether it "could . . . have been only once," she stated, "I don't really know that answer." Id.  Then she stated that it was five times before finally settling on four alleged assaults.  Of course, not every statement that D.M.K. made during the preliminary hearing was inconsistent with what she said during her interview.  However, because there were so many inconsistencies, I cannot accept an argument that petitioner was better off by failing to reveal them.

Also unpersuasive is respondent's argument that petitioner's defense could have been

harmed by D.M.K.'s "detailed" account of the assaults in her preliminary hearing testimony. Compared to D.M.K.'s interview with the police, the testimony she gave at the preliminary is decidedly *lacking* in detail.   Contrary to what D.M.K. said during the interview, at the preliminary hearing she testified that all of the assaults occurred the same way.   Dkt. #6-11 at 17, 40-42, 44.   When pressed for additional details, often D.M.K. could not provide them.   Because the police interview was significantly more detailed (and graphic), it is difficult to see how allowing the jury to consider the preliminary hearing testimony could have made the jury more likely to convict petitioner.   This is not a situation like <u>Brown v. Deppisch</u>, No. 09-cv-723, 2011 WL 2671227, at *5 (E.D. Wis. July 7, 2011), in which revealing inconsistent statements would open the door to allegations about *more* sexual assaults than what the jury would have otherwise heard about.   Rather, it would show only that D.M.K. was wildly inconsistent in her allegations about how often the assaults occurred.

Second, respondent argues that petitioner was not prejudiced by his counsel's failure to impeach D.M.K. with inconsistencies in her statements because counsel impeached D.M.K.'s testimony in other ways.   In particular, petitioner's mother testified that Kimberly never left the house unless petitioner went with her. However, petitioner's mother could have been perceived by the jury as biased in her son's favor.   Her testimony can not be equated with statements from D.M.K. impeaching herself.

Third, respondent argues that D.M.K. gave her testimony at the preliminary hearing more than a year after her interview with the police, so the jury likely would have found the statements she made closer in time to the alleged events to be "more reliable."   Dkt. #14 at

18.   As an initial matter, this argument overlooks the fact that even D.M.K.'s police interview was given more than a year after some of the alleged assaults.  In any event, this is another argument that misses the point.  The question is not simply whether the jury would find statements closer in time to the incidents "more reliable" than more recent statements; it is whether the contradictions between D.M.K.'s two sets of statements would undermine D.M.K.'s credibility *generally*.  D.M.K. did not say during the preliminary hearing that she simply could not remember what happened; rather, she gave answers that were contrary to her previous statements. Although the passage of time could explain a loss of memory, it is a less persuasive explanation for making contrary statements.

### 2) failure to identify Kimberly's inconsistent statements

Respondent gives two reasons for rejecting a conclusion that petitioner was prejudiced by his counsel's failure to impeach Kimberly with her own inconsistent statements. First, respondent says that petitioner's counsel impeached Kimberly with evidence that she lied in order to obtain a restraining order.  However, impeaching Kimberly about statements she made in a collateral proceeding is very different from impeaching her about the very allegations that formed the basis of the charges against petitioner.  It is disingenuous for respondent to suggest that the former is an adequate substitute for the latter.

Second, respondent argues that, if petitioner's counsel had introduced evidence of inconsistent statements that Kimberly made to the police, the state would have introduced Kimberly's full statement to the police, which included statements that were consistent with

24

D.M.K.'s interview, such as the allegations that petitioner "touched [D.M.K.] with his . . . fingers and with his penis" and that petitioner "stuck his dick in [D.M.K.'s] butt." Dkt. #7-3 at 2, 4. This argument fails. Because petitioner's theory of the case was that D.M.K. fabricated her allegations at Kimberly's insistence, it would not undermine his defense if there was some consistency between D.M.K.'s and Kimberly's statements, particularly when the allegations were first reported. Those consistent statements would not explain why D.M.K. would fail to tell the police significant allegations that she had told her mother about only a few days earlier, including that petitioner assaulted D.M.K. "quite often" when petitioner "took [D.M.K.] for four wheeler rides" and that petitioner threatened to "cut out [D.M.K.'s] tongue" if she told anyone what he did. Dkt. #7-3 at 2. It is particularly surprising that D.M.K. would tell her mother that petitioner threatened to seriously maim her, but then make a much less serious allegation to the police about a threat of spanking.

Further, any consistencies between D.M.K.'s and Kimberly's statements to the police would not explain why *Kimberly's* testimony changed so dramatically between the time she gave her initial statement and the time she testified at trial. On the whole, I see no plausible argument that it would have done petitioner more harm than good to introduce Kimberly's prior inconsistent statements.

### 3) failure to object to evidence of prior bad acts

Respondent does not develop an argument that petitioner was not prejudiced by the admission of evidence regarding his hiding from the police. Although counsel's failure to

object to the admission of other acts evidence may not have been as serious as counsel's other errors, it could have harmed petitioner's defense in two respects. First, D.M.K.'s statement that petitioner repeatedly hid from the police suggests not only that petitioner likely broke the law (a fact established by his admission of previous convictions), but also suggests that his criminal behavior was both frequent and serious enough to prompt him to actively evade the police by creating a hiding place in his home.

Second, and more important, D.M.K. discussed this conduct in the context of her sexual assault allegations, but she did not explain in her statement *why* petitioner was hiding from the police. In that circumstance, jurors could have drawn the inference that petitioner was hiding from the police *because* of the sexual assault allegations, which would be a damning indication of his guilt.

### 4) cumulative prejudice

In determining whether the cumulative effect of counsel's errors prejudiced petitioner under <u>Strickland</u>, I find <u>Raether v. Meisner</u>, 608 F. App'x 409 (7th Cir. 2015), to be instructive. (Neither side cited any precedential authority that involved facts similar to this case.) Like this case, <u>Raether</u> involved a Wisconsin petitioner who had been convicted of sexual assault of a child and then raised a claim for ineffective assistance of counsel. As in this case, the state had no physical evidence of an assault and defense counsel argued in his opening statement that the state's witnesses were not credible. <u>Id.</u> at 411. Despite counsel's theory of the case, he failed to expose various inconsistencies between the alleged victim's

trial testimony and the statement she gave to the police, including those related to what happened before the alleged assault and where she was after the alleged assault.

The court of appeals concluded that counsel's deficient performance prejudiced the petitioner under <u>Strickland</u>:

> In this battle of credibility, counsel's failure to make use of the witness's prior statements doomed Raether's prospects from the beginning. Had counsel cross-examined the witnesses adequately, he could have cast significant doubt on [the alleged victim's] and [the alleged victim's friend's] testimony, which was ripe for impeaching. His failure to do so is all the more striking because counsel told the jury he would undermine the witnesses' credibility but never followed through on this suggestion. . . . [A]ll counsel needed to do was undermine the credibility of the state's two witnesses. No other evidence existed on which to convict Raether. Counsel's failure to use available tools to undermine this credibility resulted in prejudice. Because of counsel's substandard performance, Raether's trial did not reliably test whether he did as he was accused.

<u>Id.</u> at 415 (citations omitted).   <u>See also</u> <u>Matthews</u>, 54 F.3d at 930 (counsel provided ineffective assistance when "case consisted primarily of the victim's testimony against that of petitioner," but "trial counsel [did not] fully attempt to discredit the victim's testimony with her prior inconsistent statements or her delay in reporting the sexual assault").

The facts in this case favor petitioner at least as strongly as the facts favored the petitioner in <u>Raether</u>. Petitioner's trial counsel had the opportunity to present potentially compelling impeachment evidence of the state's two most important witnesses, but he failed to do so, even though he promised he would. Particularly because the state's case (and petitioner's defense) relied entirely on witness credibility, there is a reasonable probability that counsel's failure to challenge the credibility of the state's witnesses in important ways affected the outcome of the case. Counsel's failure to object to the other acts evidence

simply compounded the prejudice.

Respondent makes only one argument regarding cumulative prejudice that I have not already considered.  In particular, respondent says that D.M.K.'s credibility was bolstered by the level of detail that she provided in her interview with the police.  For example, respondent points to D.M.K.'s statements that petitioner's penis "got all thick" during the assaults and that putting her mouth on his penis made her "almost puke."  Dkt. #7-2 at 25 and 43.  Respondent says that D.M.K. "would lack knowledge to provide this type of detail" if petitioner had not actually assaulted her.  Resp.'s Br., dkt. #14, at 31.

Again, because petitioner's theory was that Kimberly prompted D.M.K. to fabricate the allegations of sexual assault, it would be consistent with that theory if Kimberly gave D.M.K. the kind of specific information that respondent cites.  Particularly because D.M.K. failed to provide any of those details during her testimony at the preliminary hearing, the details do not necessarily undermine petitioner's defense.

In any event, to grant habeas relief to petitioner I need not find that D.M.K.'s statements lacked any credibility.  The standard under Strickland is not whether petitioner has proven his innocence beyond a reasonable doubt or that he would be certain to be acquitted if he were retried. Rather, the question is whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  Considering all of the evidence, as I am required to do, id. at 695, I conclude that petitioner has met that standard.

D.  Applying § 2254(d)

The last court to review petitioner's claim was the Wisconsin Court of Appeals, State v. Harrison, 2015 WI App 43, 362 Wis. 2d 539, 865 N.W.2d 884, so the final question is whether that court's decision was "contrary to, or involved an unreasonable application of" Strickland.  Gonzales v . Mize, 565 F.3d 373, 379 (7th Cir. 2009) ("We review the decision of the last state court that substantively adjudicated each claim.").  The court's opinion was a short one, spanning only a few paragraphs.  The court "assume[d], without deciding that trial counsel's performance was deficient," id. at ¶ 5, so I need not consider that issue further.  Woolley v. Rednour, 702 F.3d 411, 421-22 (7th Cir. 2012) ("Federal courts typically apply de novo review to a Strickland prong left unaddressed by a state court."). Accord Quintana v. Chandler, 723 F.3d 849, 853 (7th Cir. 2013) (following Woolley).

With respect to prejudice, the state court considered each asserted error individually. First, the court said that petitioner was not prejudiced by his counsel's failure to impeach D.M.K. for two reasons: (1) "[g]iven the age of the victim, it would be reasonable for the jury to regard the victim's reduced description of the assaults as resulting from the passage of time"; and (2) "[petitioner] has not suggested any reason that the victim would have fabricated these allegations entirely."  Harrison, 2015 WI App 43 at ¶ 5.

The state court's first reason relies on an incorrect premise and the second reason is simply incorrect.  As I have discussed above, the differences between D.M.K.'s police interview and preliminary hearing testimony were not limited to a "reduced description of the assaults."   Rather, D.M.K. provided contrary answers regarding the number of times

petitioner assaulted her, the way that petitioner assaulted her, when the assaults occurred, why she complied with petitioner's demands and the statements that petitioner made. Thus, it is inaccurate to describe the inconsistencies as simply the result of an inability to recall as many details. As also discussed above, petitioner *did* provide a reason that D.M.K. would fabricate the allegations, which is that Kimberly and petitioner were in the midst of divorce proceedings at the time Kimberly contacted the police and she wanted to prevent petitioner from obtaining custody of their children. Thus, neither reason provided by the court on this issue supports the decision it made.

Second, the court said that petitioner was not prejudiced by trial counsel's failure to impeach Kimberly because her "testimony was generally collateral, as compared to the detailed statement made by the victim in the video recording." Id. at ¶ 6. This reasoning overlooks how Kimberly's testimony was connected to D.M.K.'s. Of course, Kimberly was not a witness to the alleged assaults. Rather, because all of Kimberly's testimony relied on alleged statements that she heard from D.M.K, any attack on Kimberly's credibility was an attack on D.M.K.'s credibility. Under these circumstances, it is inaccurate to call Kimberly's testimony "collateral," particularly because her previous statements were inconsistent not only with her own trial testimony, but with D.M.K.'s statements as well.

Finally, with respect to the evidence about petitioner's hiding from the police, the court wrote the following:

> There is no specific information in the victim's statement about what offense Harrison was wanted for when hiding from the police, and therefore the jury could not reasonably infer from his being wanted that he had committed a major offense, or that it was a child sexual assault. As to the hiding itself,

30

avoiding police is relatively benign conduct. Accordingly, we see little likelihood that his being sought by, and hiding from, police would lead the jury to conclude that he was more likely to have committed the child sexual assault charged in this case.

Id. at ¶ 9.

Even if I agree with the state court that hiding from the police is "relatively benign conduct" as a general matter, the state court did not consider the context of the statements at issue. Although it is true that D.M.K. did not describe in her statement why petitioner was hiding, she gave the statement while the officer was asking her about petitioner's alleged assaults. Thus, the ambiguity in D.M.K.'s statements would have made it more, not less, likely that the jury would speculate that petitioner was hiding from the police to evade arrest for sexually assaulting D.M.K. Because hiding suggests that petitioner was guilty of the conduct for which the police were seeking him, D.M.K.'s statement was not "relatively benign" in the context of this case.

After considering trial counsel's individual errors in isolation, the state court ended its analysis, without considering the cumulative effect of the errors. In Strickland, the Supreme Court did not state expressly that courts must consider prejudice in the aggregate. However, that rule is implicit in the Court's statement that "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695. That is the way both the Court of Appeals for the Seventh Circuit and the Wisconsin Supreme Court have applied Strickland. Earls v. McCaughtry, 379 F.3d 489, 495–96 (7th Cir. 2004) ("[W]here . . . the defense attorney made multiple errors as opposed to a single error, the cumulative effect of those errors should be considered

together to determine the possibility of prejudice."); Hough v. Anderson, 272 F.3d 878, 891 (7th Cir. 2001) ("We previously have pointed out that prejudice may be based on the cumulative effect of multiple errors. Although a specific error, standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may be sufficient.") (citations omitted); State v. Thiel, 2003 WI 111, ¶ 59, 264 Wis. 2d 571, 603, 665 N.W.2d 305, 321 ("[I]n determining whether a defendant has been prejudiced as a result of counsel's deficient performance, we may aggregate the effects of multiple incidents of deficient performance in determining whether the overall impact of the deficiencies satisfied the standard for a new trial under Strickland.").  In fact, as petitioner points out, the Court of Appeals for the Seventh Circuit has held that a state court's failure to consider the cumulative prejudice of counsel's errors qualifies as an unreasonable application of Strickland.  Goodman v. Bertrand, 467 F.3d 1022, 1030 (7th Cir. 2006) ("In weighing each error individually, the Wisconsin Court of Appeals overlooked a pattern of ineffective assistance and unreasonably applied Strickland.").  Respondent does not address this issue in her brief, which could be sufficient reason by itself to rule in petitioner's favor. Lafler v. Cooper, 132 S. Ct. 1376, 1390 (2012) (if state court fails to apply Strickland standard, federal court may review claim de novo.)

    Even if I assume that the state court's decision is entitled to deference, I conclude that the decision was objectively unreasonable under Strickland.  Because credibility was such a central issue in the case and the inconsistent statements petitioner's trial counsel failed to reveal were so significant, the case the jury heard was very different from the case that it

should have heard. Under these circumstances, I see no reasonable basis for rejecting the conclusion that the errors of petitioner's trial counsel prejudiced him to such an extent that it undermines confidence in the outcome of the case.  Petitioner's trial "did not reliably test whether he did as he was accused," Raether, 608 F. App'x at 415, so he should have the opportunity to receive the fair trial that the Constitution guarantees him.  Accordingly, I am directing respondent to release petitioner within 120 days unless the state elects to retry petitioner before then.  Ray v. Clements, 700 F.3d 993, 1018 (7th Cir. 2012) (giving state 120 days to release or retry petitioner after awarding habeas relief); Jones v. Basinger, 635 F.3d 1030, 1056 (7th Cir. 2011) (same);  Goudy v. Basinger, 604 F.3d 394, 402 (7th Cir. 2010) (same); Gentry v. Sevier, 597 F.3d 838, 852 (7th Cir. 2010) (same); Smith v. Grams, 565 F.3d 1037, 1047 (7th Cir. 2009) (same).

ORDER

IT IS ORDERED that

1.  Petitioner Richard H. Harrison, Jr.'s petition for a writ of habeas corpus under 28 U.S.C. § 2254 is GRANTED.

2. Respondent Lizzie Tegels must release petitioner within 120 days from the date of this opinion unless the state elects to retry petitioner before then.

3.  The clerk of court is directed to enter judgment in favor of petitioner and close this case.

Entered this 27th day of October, 2016.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge